UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

JONATHAN WAYNE HENRY,

                Petitioner,                Case No. 1:12-cv-474

v.                                   Honorable Robert J. Jonker

KENNETH McKEE,

                Respondent.

_____/

### REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Jonathoan Wayne Henry is serving two prison terms of 12 to 40 years, imposed by the Kalamazoo County Circuit Court on March 1, 2010, after a jury convicted Petitioner of one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b, and one count of third-degree criminal sexual conduct (CSC III), MICH. COMP. LAWS § 750.520d(1)(a).[1] In his *pro se* petition, Petitioner raises two grounds for relief:

    I.      14th Amendment "Due Process" Prosecutor Improperly elicited testimony from his witnesses which vouched for the credibility of victim[.]

    II.     5th & 14th Amendment "Double Jeopardy & Due Process[.]"

(Pet., ECF No. 1, PageID ##6-7.) Respondent has filed an answer to the petition (ECF No. 10) stating that the grounds should be denied because they are without merit. Upon review and applying

---

[1]Petitioner was sentenced as a fourth felony offender, MICH. COMP. LAWS § 769.12.

the AEDPA standards, I find that Petitioner's grounds for habeas relief are procedurally defaulted and/or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the forcible rape of a 15-year-old girl. Petitioner was charged with one count of CSC I, and, in the alternative, CSC III. Following a preliminary examination held on May 13, 2009, Petitioner was bound over on the alternative charges. A supplemental information was filed charging petitioner as a habitual offender, fourth offense. Petitioner was tried before a jury beginning on January 26, 2010, and concluding on January 28, 2010.[2]

On the morning of the first day of trial, the prosecutor moved to amend the information in accordance with recent Michigan law, permitting charging CSC I and CSC III as two separate counts, not as alternative charges for a single count. (Tr. I at 3-4.) Defense counsel objected to the belated amendment, but, after reading the proffered case, the court permitted the amendment. (*Id.* at 4.)

Theresa Snider testified that she was the mother of RH, who was 15 on August 19, 2008, but 16 at the time of trial. Snider testified that RH was living with her in the Pavilion Estates Trailer Park near Sprinkle and Kilgore in Kalamazoo County. (Tr. II at 6.) Raquel Ledezma, who was 21 years old on that date, also was living with Snider. Snider testified that she had known

---

[2]Hereafter the transcripts of the three days of trial will be referenced as follows:

January 26, 2010 (ECF No. 14): "Tr. I at ___."
January 27, 2010 (ECF No. 15): "Tr. II at ___."
January 28, 2010 (ECF No. 16): "Tr. III at ___."

Ledezma since Ledezma was a child, and that Ledezma was like a sister to her. (*Id.* at 7.) Ledezma and RH used to go out almost every night to take walks after Snider came home from work at 11:15. (*Id.* at 7-8.) On the date of the incident, RH was on summer vacation, expecting to enter tenth grade in the fall. (*Id.* at 9.) More than an hour after RH and Ledezma left, Ledezma woke Snider because she had a medical issue. RH seemed very agitated and irritated, but she did not tell her mother what was wrong. (*Id.* at 10.) Later that night, they took Ledezma to the hospital. After about an hour-and-a-half, RH told her mother what had happened to her. She was shaking and crying uncontrollably. Snider told RH that they were going home and calling the police, which they did. They spoke to Deputy Ruggles. (*Id.* at 12.) RH, with difficulty, told Ruggles what had happened. Snider then took RH to the YWCA to complete a rape test kit. (*Id.* at 13-14.) RH was distraught, clinging to her mother before the vaginal examination, saying, "Mom, I can't do this. It hurts, it hurts. I'm scared. Please tell 'em to stop." (*Id.* at 14.) RH did, however, participate in the examination. She also subsequently located the underwear she was wearing at the time of the assault. (*Id.*) After the incident, RH became very paranoid, regularly had nightmares, threatened to commit suicide, was afraid to be around men, even family members, and lost all playfulness. (*Id.* at 13.)

RH testified that she was 15 years old at the time she was raped. Because of the assault, she dropped out of high school after her ninth-grade year. (*Id.* at 18.) She lived with her father in Lawrence, Michigan during the school year, but she lived with her mother in the Pavilion Estates in Kalamazoo, Michigan in the summer. (*Id.* at 19.) She used to have friends, but, after the assault on August 19, 2008, she preferred to be by herself and avoided groups. (*Id.* at 20.) Raquel (Ledezma) was RH's mother's roommate and RH's best friend. Ledezma and RH used to go for

walks in the evening. Ledezma had had surgery a long time before, and the site caused her pain and muscle spasms, which were aggravated by the kicking of the baby she was carrying. (*Id.* at 21.) The walks helped to alleviate the pain. On the night in question, they left late at night, some time after her mother got off work. (*Id.* at 22.) After they walked around the block, they sat on the steps. Petitioner and Shawn came up and started talking to them. RH had occasionally seen Petitioner around the trailer park. (*Id.* at 23.) Raquel knew Shawn. Petitioner invited Raquel and RH to Petitioner's house to hang out and watch movies. (*Id.* at 24.) RH agreed, because Raquel knew Shawn and Shawn wanted to catch up with her because he had not seen her for awhile. They also had nothing better to do. (*Id.* at 24-25.) RH testified that Petitioner's trailer was in the same park, about two-and-a-half blocks away. When they first arrived, they watched some TV in the living room and talked a little. (*Id.* at 25-26.) Petitioner asked RH if she wanted to watch movies. When she said she did, he told her that she was the company, so she could pick out the movie, but he kept them in the back, in his room. (*Id.* at 26-27.) RH went to the bedroom, and she sat on the edge of the bed to look at the movies. Petitioner came in behind her and locked the door. He then told her that she was going to sleep with him and suck his penis. She got up to leave, but he grabbed her by her hair and her arm and threw her back onto the bed. Petitioner was beside and on top of her, choking her. (*Id.* at 28-29.) While still choking RH, Petitioner took off his pants. He told her that she had to take off her clothes in order to sleep with him. (*Id.* at 29-30.) RH was terrified, and, at Petitioner's direction, she pulled down her pants and underwear. (*Id.* at 30.) RH testified that she did not want to comply and told Petitioner that more than once. Once RH's pants were off, Petitioner vaginally penetrated her with his penis, and he simultaneously choked her and tried to pull her shirt down. Petitioner also scratched her breasts. (*Id.* at 31-32.) RH had never engaged in

intercourse before. She thought she was going to die. She could not scream because she could hardly breathe while he was choking her. RH testified that she did not know how long Petitioner was on top of her; it seemed like "[f]orever." (*Id.* at 33.) Petitioner yelled at her. When she cried, he hit her in her side and told her to call him "daddy." (*Id.*) After Petitioner finished, he got off RH and wiped himself off. RH hurriedly put on her clothes, unlocked the door and ran out. When she got to the front door, she told Raquel that she was leaving. As she reached the bottom step of the porch, Petitioner kicked RH in her lower back and told her, "'Bitch, this isn't over,' and that [she] was going to finish what he started." (*Id.* at 34.) RH did not wait for Raquel, because she was afraid and wanted to get out of there. (*Id.*) Petitioner told RH that if she told anyone about the assault, he would kill her. (*Id.* at 43.) RH immediately went to her mother's home. (*Id.* at 35.)

When she arrived home, RH did not immediately tell her mother, because she was afraid, she hurt, and she felt like her whole life had been taken away. RH went into the bathroom and tried to wipe off, but her vaginal area hurt very badly. She then pulled her underwear and pants back up, curled in the corner of the room and cried until she fell asleep. (*Id.* at 36.) She did not shower or bathe. (*Id.* at 44.) Later that day, she changed her underwear and pants before going to the hospital with her mom and Raquel. (*Id.* at 36, 57.) She had not told them, but they knew something was wrong, because she was crying a lot, shaky, throwing up, and rude to the others. (*Id.* at 36.) Both her mom and Raquel asked her what was wrong, but she did not tell them until they were at the hospital. (*Id.* at 37.) RH first told Raquel, who urged her to tell her mother. When she did, her mother began crying and said that they had to call the police. When a deputy arrived, she came out and spoke to him, after which she went to the YWCA to get a rape kit completed. (*Id.*) RH brought the underwear she had been wearing to the YWCA. (*Id.* at 39.) When the deputy was

taking her to the YWCA, she pointed out the trailer at which the assault occurred. (*Id.* at 44.) At the YWCA, the nurse examined her vaginal area, an examination that RH had never experienced before. RH was afraid and uncomfortable, and she started crying and pulling away. She told the nurse what had happened. (*Id.* at 38.)

      Officer Ruggles came back to talk to her after the initial conversation, bringing a photographic lineup. RH identified the person in the sixth photograph, Petitioner, as her assailant, despite the fact that the person in the photograph had long hair and Petitioner was bald at the time of the incident. (*Id.* at 45.) After the police had completed their investigation, RH went to the prosecutor's office and talked to a prosecutor. She subsequently testified at the preliminary examination. (*Id.* at 38.) RH identified the green or aqua underwear she was wearing that night, and she identified the pictures taken by the YWCA of the scratches on her chest. (*Id.* at 38-39.) She also identified the Peoples Exhibit 4 as the photographic lineup shown to her by Officer Ruggles. (*Id.* at 45.) In addition to the scratches on her chest, RH testified that her arm was sore from where Petitioner grabbed her, she had pain in her lower back from where Petitioner kicked her, and her vaginal area was swollen and very sore. (*Id.* at 40.) At the time of the assault, RH did not know what "ejaculation" was. By the time of trial, she knew what it was but did not know if Petitioner had ejaculated. However, when she wiped herself, she had "nasty, clear, sticky-looking stuff on the toilet paper. (*Id.* at 41.) RH testified that the assault tore her life apart, made her cry every day, gave her nightmares, and made her feel hollow inside. Because she now gets panic attacks around a lot of people, she dropped out of school. (*Id.* at 42.) RH testified that she tried going to counseling, but she did not feel comfortable talking about the incident with someone she did not know. (*Id.* at 44.) Shortly before coming into the courtroom to testify, RH began panicking, having trouble breathing,

and crying, because she was afraid of testifying and did not want to be in the same room as Petitioner. (*Id.* at 45.)

Raquel Ledezma, age 23, testified that she was good friends with both RH and Snider, and she had known them for seven years. (*Id.* at 62-63.) In August 2008, Ledezma lived with Snider and RH at the Pavilion Estates Trailer Park. She went for walks with RH, mostly at night, to relieve some of the medical issues she had. On the night of August 19, 2008, she went for a walk with RH, but she did not know the time. (*Id.* at 63-64.) After walking, the two sat down on some stairs down the block. Ledezma saw Shawn with his friend, whom Shawn named as "Jeffrey." Ledezma knew Shawn and his brother. Shawn asked if they wanted to come over, hang out, and watch a movie at Jeffrey's house. (*Id.* at 64-65.) She identified Petitioner as the man identified as Jeffrey, but she had never seen him before that night. (*Id.* at 65.) After they arrived at Petitioner's trailer, they watched TV for awhile. When the others mentioned watching a movie, Ledezma got up to go to the bathroom. She saw RH stand up as she left. Ledezma remained in the bathroom for 25 or 30 minutes, as she had stomach issues. (*Id.* at 66.) While she was in the bathroom, she heard a sound like someone being smacked, but she assumed that it was the TV. When she got out of the bathroom, she saw RH walking out of the house. RH looked like something had happened: she was red-faced and looked like she had been crying. (*Id.* at 67-68.) As RH went outside, Petitioner went out behind her. Petitioner came back in and did not say anything. When RH did not come back, Ledezma grabbed her coat and left. By the time she got outside, RH was gone. (*Id.* at 68.) Ledezma went home. When she arrived, RH was emotional and would not stop crying. (*Id.* at 69) Ledezma also observed that RH had a red neck. (*Id.* at 74.) Ledezma tried to talk to RH, but RH wanted to be left alone. The next night, Ledezma had to go to the hospital because of severe pain in her

stomach. RH came to the hospital, though she was still emotionally upset and angry at the world. Ledezma repeatedly tried to talk to RH to find out what had happened. Eventually, after Ledezma had been admitted to a room, RH told her what had happened. Ledezma encouraged her to talk to her mother. (*Id.* at 69.) Ledezma was not released from the hospital until 7:00 the next morning. She was not at the trailer when the police came or when RH went to the YWCA. Ledezma testified that RH is a changed person since the event. RH is more emotional, more isolated, and subject to panic attacks. (*Id.* at 72.) Ledezma was shown the same lineup as RH, and she tentatively identified number six, though she thought number four was possible. (*Id.* at 73-74.) Ledezma indicated that Petitioner was bald on August 19, 2008, and the man in photograph number six had long hair. (*Id.* at 77-78.)

RH was recalled to the stand. After some confusion, she clarified that she was raped sometime after midnight, in the early morning of August 19, 2008. By the time she fell asleep after the assault, it was getting light outside. On the night of August 19, 2008, they took Ledezma to the hospital. (*Id.* at 86-87.) They called the police in the morning hours of August 20, 2008, though she did not remember if it was still dark. (*Id.* at 84-85, 87.) It was daylight on August 20, 2008 by the time she went to the YWCA. (*Id.* at 85.)

Kalamazoo County Deputy Sheriff Daniel Ruggles testified that the victim called at approximately 4:30 or 5:00 a.m. on August 20, 2008, reporting a rape that occurred between 1:00 and 3:00 a.m. on August 19, 2008. The call was made a little over 24 hours after the reported incident. (*Id.* at 88.) Ruggles went to RH's home and spoke with her. She was extremely upset and crying. In light of her age, the interview lasted only five or ten minutes, and he got only the basic facts. (*Id.* at 89.) The in-depth interviewing of minors is left to a professional person at the YWCA.

While he was talking to RH, she kept crying and looking down, as if ashamed. She made little eye contact. Her behavior was not uncommon for a teenage sexual-abuse victim. (*Id.* at 90.) Ruggles discussed with RH the importance of locating and bringing the underwear she had been wearing at the time of the assault. Ruggles was not in the same car as RH and her mother, but he followed them. He had asked RH if she would point out the trailer as she left, and she did so. The trailer matched the description she had earlier provided. (*Id.* at 91.)

Ruggles went to the trailer RH had identified and knocked at the door. Petitioner answered the door and identified himself as Jonathan Henry, Sr. Ruggles asked him to step outside so that he could interview him. Petitioner had on shorts and shoes, but no shirt, though it was cold outside. Ruggles told Petitioner that a young girl had alleged that she had been raped by him. Petitioner immediately began sweating profusely, and his demeanor changed. (*Id.* at 92-93.) Shortly thereafter, Petitioner went beyond the car and began vomiting. After returning briefly, he moved to vomit again. After some time, during which Petitioner continued to sweat, Petitioner eventually refused to continue talking. (*Id.* at 94.) Petitioner initially refused to allow Ruggles to come inside and go to the bedroom, but he eventually allowed Ruggles to come into the living room to pick up the sheets that had been placed on a chair. Petitioner's mood changed rapidly, from extreme anger to normal conversation and back. (*Id.* at 95.) At the time Ruggles interviewed Petitioner, Petitioner's head was shaved, and he was basically bald. (*Id.* at 96.) Ruggles observed tattoos on Petitioner that were consistent with the description given by RH, including the date of his son's birth and a picture of his face. (*Id.*) One of the detectives put together a photographic line-up of similar-looking men, with Petitioner in the sixth position. Ruggles showed the array to RH, and she promptly identified the sixth photo, despite the fact that Petitioner looked very different on the day

Ruggles talked to him (essentially bald) than in the photo (long hair). (*Id.* at 97-99.) Ruggles also separately showed the array to Ledezma, who leaned toward photo six, but said that photo four also was possible. (*Id.* at 99-100.) The photo of Petitioner was taken in 2000, eight years before the lineup was created. (*Id.* at 100.)

Kalamazoo County Sheriff Detective Richard Mattison testified that he performed follow-up work on the case. He went to Petitioner's trailer to get a sample of Petitioner's DNA for comparison to the DNA obtained during the rape examination. (*Id.* at 111.) He asked to take a buccal swab from Petitioner, but Petitioner refused. (*Id.* at 112.) Mattison then obtained a search warrant, at which point he obtained a swab and sent it to the Michigan State Police forensic laboratory for comparison and testing. (*Id.* at 113.)

Laurie Sweet testified that she was an R.N. at Bronson Hospital and also a sexual-assault nurse-examiner for the YWCA of Kalamazoo. (*Id.* at 114-15.) Since 2001, Sweet had performed approximately 250 medical forensic examinations of victims of sexual assault. (*Id.* at 115-16.) On August 20. 2008, she saw RH at about 9:00 a.m. (*Id.* at 116.) She took a history from RH about the sexual assault. (*Id.* at 117.) As is her usual custom, Sweet wrote the history using, as much as possible, verbatim quotes. RH told Sweet that she had been walking with her sister, when she ran into Shawn and "Jeffrey." RH's sister knew Shawn, and the men invited RH and her sister to their house to watch movies. The women got into the car with the men and drove to Jeffrey's house. The men were smoking marijuana. RH and Jeffrey went into Jeffrey's bedroom, and Jeffrey shut the door and locked it. RH asked what he was doing, and Jeffrey told her that she was going to "suck his junk and sleep with [him]." (*Id.* at 118.) Jeffrey grabbed RH by the hair and threw her on the bed. RH was terrified, and Jeffrey made her take her pants off and pushed her back on the

bed. RH was crying, and Jeffrey told her, "[W]hen you cry, call me daddy." (*Id.*) RH was really

scared, and Jeffrey was sitting on her. Jeffrey had a hand on her throat and was choking her. (*Id.*)

He kept pushing her back on the bed, and she was just lying there. She would not do what he asked,

but he just did what he wanted. Then Jeffrey got up and wiped off with a towel and again told her

that she would perform sex acts. He said, "This isn't over." RH got up, pulled on her pants, and

went out to the living room, telling her sister that she was leaving. She left, and as she was going

down the stairs, Jeffrey kicked her on the right side of her neck. RH ran home and went to her room.

In the bathroom, she wipe off "nasty, sticky white stuff." (*Id.* at 119.) She went to bed without

telling anyone. She finally told her sister the next morning. Her sister made her tell her mother, and

her mother called the police. (*Id.*)

       Sweet testified that she understood that the person RH referred to as her sister was

not her actual sister, but someone she treated as a sister. (*Id.*) In response to further questioning by

Sweet, RH stated that Jeffrey had fondled her breasts, kissed her mouth, and bit her neck on both

sides. RH reported that Jeffrey held his hand against her neck, preventing her from breathing or

screaming. Jeffrey "stuck his private part inside me and it hurt." (*Id.* at 120.) RH clarified that she

meant his penis. RH stated that she assumed Jeffrey ejaculated because he wiped off after. (*Id.*)

According to Sweet, RH was traumatized, jumpy and nervous. (*Id.* at 121.) Sweet noted that RH

had a scratch above her right breast an inch-and-a-quarter long. RH also complained of having pain

in the left flank area and tenderness doing the pelvic examination. (*Id.* at 122.) She also complained

about pain in her neck and her back. (*Id.* at 123.) Sweet could not see the vaginal walls, as she was

unable to insert the speculum. She saw no physical evidence of trauma to the vaginal area, though

such injuries were not present in 80 percent of the examinations she conducted, even in cases

involving force. (*Id.*) Sweet inserted cotton-tipped swabs into RH's vagina and took blind swabs. She also obtained buccal swabs. (*Id.* at 124.) Sweet also logged in and sealed the panties that RH had picked up from her floor. (*Id.* at 125-26.) She packed the off-white pair RH was wearing, another off-white pair, and a blue (blue-green or aqua) pair in the assault-kit mailer. She noted that the second off-white pair had dried secretions present. The other four pair were packed separately. (*Id.* at 127-28, 131.)

Lisa Champion was employed as a forensic scientist with the Michigan State Police at the Grand Rapids Forensic Laboratory in the Biology Unit. (*Id.* at 138.) Champion was accepted as an expert in serology. (*Id.* at 140.) She performed a chemical test on a cutting of the vaginal swabs and observed the presence of seminal fluid. (*Id.* at 142.) Under microscope, she observed one sperm cell. (*Id.* at 143.) She tested three pairs of panties. The green panties tested positive for seminal fluid. Champion prepared a microscope smear and observed sperm cells. She then forwarded both cuttings from the vaginal swabs and the panties for DNA analysis. (*Id.* at 144.) She also submitted the prepared buccal swab from RH. (*Id.* at 145.)

Michigan State Police Forensic Scientist Kirk Deleeuw testified as an expert on DNA. (*Id.* at 157.) Kirk analyzed the DNA samples prepared by Champion, as well as the buccal sample from Petitioner. (*Id.* at 157-58.) He developed genetic profiles from the buccal samples from RH and Petitioner. When he first developed the DNA samples taken from the vaginal swabs and underwear, he found DNA from RH and an unknown male, as he did not yet have Petitioner's sample. (*Id.* at 161.) When he later compared the DNA from the vaginal swab with Petitioner's DNA, he found that Petitioner could not be excluded as being a donor from all eight of the thirteen examined locations that contained a mixture containing predominantly the victim's DNA. (*Id.* at

162-64.)  Statistically, the probability of having such DNA was one in 8.4 thousand for the Caucasion population, one in 30.2 thousand for the African-American population, and one in 5.5 thousand for the Hispanic population.  (*Id.* at 165.)  The DNA taken from the underwear, which was from a single donor source, matched Petitioner's DNA profile with a probability of one in 1.2 sextillion for the Caucasion population, one in 82.3 quintillion for the African-American population, and one in 1.2 sextillion for the Hispanic population.  (*Id.* at 167-68.)  Statistically, the DNA profiles from the panties and from Petitioner's buccal swab were the same.  (*Id.* at 170.)  In addition, the female epithelial cells found on the panties belonged to RH.  (*Id.*)

Connie Black-Pond testified as the Clinical Director and Co-Director of the Southwest Michigan Children's Trauma Assessment Center at Western Michigan University.  (*Id.* at 180.)  Black-Pond was certified as an expert in the field of sexual abuse and disclosure.  (*Id.* at 182.)  She testified that it was normal for a 15-year-old victim to delay disclosing a sexual assault, and that waiting for 27 or 28 hours to disclose was a relatively rapid disclosure.  (*Id.* at 183.)  Such victims tend to be embarrassed and ashamed, tend to be confused and wish the event would go away, and tend to fear what will happen if they tell.  (*Id.* at 184.)  Fears increase when there has been a verbal or physical threat.  In addition, it is more common than not that a teenager who has been assaulted will not tell her parents first.  One common reaction might be to withdraw or to avoid people or places that remind them of the assault.  (*Id.* at 185-86.)  Victims may also suffer panic attacks.  (*Id.* at 187.)  Many sexual assault victims have difficulty talking about the attack and avoid counseling, as part of their avoidance of anxiety-producing circumstances.  (*Id.* at 187.)  Further, victims of assault frequently have difficulty with memory regarding the details of the assault.  (*Id.* at 188.)  Black-Pond acknowledged that she had never examined or counseled RH.  (*Id.* at 189.)

At the close of the prosecutor's case, Petitioner moved for a directed verdict of acquittal. (*Id.* at 191.) The court denied the motion, citing the admitted evidence. (*Id.* at 191-93.)

Petitioner called Norberto Againeses, the brother of Petitioner's girlfriend. Againeses testified that the police contacted him about an incident involving Petitioner in August 2008. Petitioner had argued with Againeses' sister, and Againeses was going to the trailer to make sure everything was alright, while Againeses' mother was going to pick up his sister. He went at approximately 10:30 or 11:00 p.m., and he stayed an hour or hour-and-a-half. He then went home, and Petitioner and Shawn followed him there. They remained at Againeses' home until about 3:00 a.m. (*Id.* at 196.) Againeses could not recall the date of the incident. He did not tell the police about the incident for at least six months, and only when the police interviewed him February 3, 2009, despite the fact that he knew they were looking for him as early as October 31, 2008. (*Id.* at 197-98, 205-06.) On the night of the incident, his sister went to stay with her mother for awhile. (*Id.* at 200.)

Shawn Brown testified that he and Petitioner were best friends. They were hanging out at Petitioner's house when Petitioner and his girlfriend (Sissy) got into an argument, after which she went to her mother's house for awhile. (*Id.* at 207.) Her brothers Berto, Emilio and another brother came over at about 10:30 or 11:00 p.m. to make sure everything was fine with Sissy and the children. When they came, the other people at the house were Petitioner, Little Jon (Petitioner's son), a man called "Cripple Mike," Sissy's brother Darnell, another friend of Little Jon's (Little Chuck), Sissy and the kids. After Sissy and the children had gone, Berto invited Petitioner and Shawn to his house. They stopped to get beer and then went to Berto's house, where they stayed until 2:30 or 3:00 a.m. (*Id.* at 208.) When they got home, Brown started to watch a movie. Petitioner said he was tired, and he went to bed. Brown passed out sometime during the movie. (*Id.*

at 209.)  Shawn knew RH slightly, but he denied going for a walk or picking up any girls in the car. (*Id.* at 209-10.)

Sandra Johnson, the mother of Petitioner's girlfriend, testified that on an uncertain date in August 2008, her daughter called her and wanted to be picked up because she and Petitioner were having an argument.  Johnson received the call between 10:00 and 10:30 p.m.  (Tr. III at 5.) She went over and was at the trailer for one-half to one hour.  Others at the apartment included her daughter, Sandra, Petitioner, Petitioner's son "Little Jon," her grandchildren, a man named Chuck, and one other man.  Johnson testified that Petitioner wore shorts only when he played basketball or went swimming, because he had a skin condition, like psoriasis.  (*Id.* at 6.)  Sandra left with Johnson and the two were separated briefly.  On cross-examination, Johnson repeated that she did not know the exact date of the incident and mentioned it to the police for the first time on July 14, 2009.  (*Id.* at 7.)

Christopher Pease testified that Petitioner's girlfriend was his cousin.  He was with Norberto Againeses at a house sometime in August 2008.  Petitioner and Shawn arrived at about 10:00 p.m. and stayed until after 1:00 a.m.  (*Id.* at 10.)

Sandra Againeses testified that she was Petitioner's fiancée and had known him for eight years.  She lived with Petitioner on Pavilion Drive in August 2008.  On August 18-19, 2008, she was living there.  That night, she and Petitioner got into an argument, and she called her mother. Her mother picked her up between 10:00 and 11:00 p.m.  She came back the following afternoon. (*Id.* at 13.)  Sandra Againeses testified that they kept their videos in the living room.  She also stated that she was missing a pair of teal thong panties and a pair of green camouflage panties.  (*Id.* at 14.) She also testified that Petitioner did not own any "Dickie shorts."  (*Id.* at 15.)

Petitioner testified that the police came to his house at 5:00 a.m. on a morning in August, waking the whole house. He put his shoes on and went outside to talk with the officer. The officer told Petitioner that he had heard that there was an assault at the house. (*Id.* at 17.) Petitioner did not know anything about that assault. (*Id.* at 18-19.) Petitioner was not nervous initially, because he thought the officer was talking about his son. When the officer made clear that he was being accused, Petitioner became very nervous, because he was not even home, but he was getting accused of something. Petitioner stated that he was home all day. They had barbequed and played basketball. A group of people was there, including some of Petitioner's friends, his son and friends, his two babies, Little Chuck, Cripple Mike, a dark-skinned man named Justin, and Jordan. (*Id.* at 19-20.) People began to leave at about 9:00 or 9:30. Chuck, Jonathan, Deuce, Darnell and Cripple Mike were still there. Petitioner got into an argument with his girlfriend at about 10:00 p.m. She called her mother and her mother called Roberto. Roberto and two of his brothers, Milio and Brandon, came over and talked for a few minutes. Roberto asked if Petitioner wanted to come over to Roberto's house. Petitioner, Shawn, Roberto and his brothers all left and went to Roberto's house at about 11:30 p.m. or 12:00 a.m. (*Id.* at 20.) They stopped at the Circle K to get beer on the way over. Petitioner's son Jonathan, Cripple Mike, and Deuce left Petitioner's house, and Deuce took some movies from Petitioner. Chuck stayed to finish cooking the pork chops that Sandra had been making. Petitioner went to Roberto's house and did not come home until about 3:15 or 3:30 a.m. (*Id.* at 21-22.) Petitioner testified that his son owned a pair of Dickie shorts, but he did not. Petitioner also stated that he kept his movies in the living room, not in the bedroom. In addition, Petitioner had had a back surgery, which left him with weight restrictions on lifting. Petitioner also testified about his tattoos; he had a devil on his chest, a wolf on his arm, and the face of his son on

his back.  He indicated that the tattoo on his back was large, and the name under it was visible from a long distance.  (*Id.* at 24.)

On cross-examination, Petitioner admitted smoking marijuana and drinking alcohol that night, but he denied smoking in the trailer; he smoked at Roberto's house.  On the day in question, Petitioner had a short hairstyle.  (*Id.* at 25.)  Petitioner testified that he had never seen RH before arriving at the courthouse for the first time.  He acknowledged that he knew Rachel Ledezma, because he was friends with her baby's father.  Petitioner stated that he was proud of his tattoo, so he did not often wear a shirt.  He had his shirt off at least part of that night.  (*Id.* at 26.)  Petitioner testified that Shawn drove to Norberto's house and that they both eventually slept at Petitioner's trailer.  (*Id.* at 27-28.)  Plaintiff also acknowledged that he would not give a saliva sample without a warrant and would not let the police come into the house.  He stated that the sheets were already off the bed by the time the officers saw them.  (*Id.* at 28-29.)  Petitioner stated that his son was 14 years old and looked a great deal like him.  (*Id.* at 30.)

On rebuttal, Deputy Daniel Ruggles testified that he spoke with Shawn Brown on October 31, 2008.  (*Id.* at 31.)  At the time Ruggles talked to Brown, Brown did not mention all of the people that Petitioner stated were at the house.  (*Id.* at 32.)  Ruggles also interviewd Petitioner's girlfriend on the day he first stopped by.  Although she remained in the house for awhile, she came outside.  She was aware of the allegations, but she did not mention that she had lost some underwear.  (*Id.* at 33.)

RH also took the stand on rebuttal.  She again identified the panties marked as exhibits as her own.  (*Id.* at 35.)  She testified that none of the panties were lace or were thongs.  (*Id.*

at 36.)  Theresa Snider, RH's mother, also identified the panties as those she had bought for RH. She helped RH collect the underwear to take to the YWCA.  (*Id.* at 37.)

At the conclusion of trial, on January 28, 2010, the jury found Petitioner guilty of one count of CSC I and one count of CSC III.  (Tr. III at 84.)  On March 1, 2010, Petitioner was sentenced as a fourth felony offender to serve two prison terms of 12 to 40 years.  (Sentencing Transcript, (S. Tr.), 19, ECF No. 17.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 20, 2010, raised three grounds, the first two of which are raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 18.)    By unpublished opinion issued on May 19, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 5/19/11 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 18.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims presented to and rejected by the Michigan Court of Appeals.  By order entered September 26, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 19.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other

explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.  Prosecutorial Misconduct

In his first ground for habeas relief, Petitioner contends that the prosecutor committed misconduct by improperly eliciting testimony from Deputy Ruggles that vouched for the credibility of the victim. Specifically, he argues that Ruggles testified that, when telling her story, the victim cried, acted ashamed and would not make eye contact with him. In addition, Petitioner argues, Ruggles testified that, in his experience, the victim's response was not an uncommon one for sexual-abuse victims and that the victim seemed credible to Ruggles. (*See* Tr. II, 90, 106.)

On direct appeal, Petitioner argued that the prosecutor committed misconduct by allowing both nurse-examiner Sweet and Deputy Ruggles to vouch for the credibility of RH. In his habeas application, Petitioner raises prosecutorial misconduct only with respect to the prosecutor's

questions to Deputy Ruggles.[3]  The state court concluded that the claim had not been preserved by

contemporaneous objection, but, applying plain-error review, Petitioner was not denied a fair trial.

In relevant part, the court of appeals stated:

> Defendant argues that he is entitled to a new trial because the prosecutor elicited testimony from . . . Ruggles that vouched for the credibility of RH.  We disagree.  We review these unpreserved claims of prosecutorial misconduct for plain error affecting defendant's substantial rights.  *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).

> The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial.  *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009).  Claims of prosecutorial misconduct are reviewed on a case-by-case basis, evaluating the prosecutor's conduct in context of the entire record.  *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010).  Because the credibility of the witnesses is a determination for the fact-finder, it is improper for a witness to comment on or provide an opinion of the credibility of another witness.  *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985).

> . . .

> Defendant also claims that Ruggles' testimony that, during his interview of RH, that RH cried, kept her head down, and failed to make eye contact improperly vouched for the credibility of RH.  Contrary to defendant's assertion, this testimony by Ruggles did not vouch for the credibility of RH.  Ruggles merely explained RH's demeanor during the interview, and RH's demeanor was relevant to the jury's credibility determination of RH.[1]  Further regarding Ruggles' testimony, defendant claims that questions asked by the prosecutor during redirect examination of Ruggles constituted improper vouching.  During redirect the prosecutor asked Ruggles whether during the interview RH appeared credible, waivered on any details, was inconsistent in anything she said, and had an appropriate demeanor for a sexual assault victim.  Ruggles answered that RH did not waiver and was consistent on the details and had an appropriate demeanor.[2]

---

[3]Even if Petitioner had not abandoned his prosecutorial-misconduct claim concerning the testimony of nurse-examiner Sweet, his claim would have failed.  Petitioner argued only that the evidence of RH's statements to Sweet should not have been admitted, not that the prosecutor's questioning was improper.  Petitioner cannot demonstrate that the prosecutor committed misconduct by offering evidence that ultimately was admitted at trial.  "'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'"  *See Bales v. Bell*, 788 F.3d 568, 577 (6th Cir. 2015) (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)); *see also Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 1999).

However, on cross-examination, defense counsel had asked Ruggles why, "[i]f it was such a heinous crime," he did not arrest defendant on August 20, when he visited defendant's trailer. Ruggles replied that he wanted to get more evidence. The prosecutor's questions on redirect that defendant is challenging, and those asked immediately before by the prosecutor, elicited further explanation from Ruggles regarding why he did not arrest defendant that night. Ruggles, through the questioning, explained that based on his interview with RH, he had probable cause to arrest defendant, but he chose not to because he wanted to conduct a "thorough investigation." Under these circumstances, the prosecutor's questions to Ruggles were not improper because they responded to questions that had been asked by defense counsel on cross-examination. *See People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007).

[1] Ruggles further testified that RH's demeanor was not uncommon for a teenage sexual abuse victim, especially when questioned by a male police officer. The testimony was based on Ruggles's perception of RH and was helpful to the determination of a fact in issue. MRE 701. Defendant makes no argument that this testimony was improper testimony from a lay witness.

[2] According to the transcript, Ruggles provided no answer to the question whether RH appeared credible.

(MCOA Op. at 2-4, ECF No. 18.)

Respondent argues that Petitioner's claim is procedurally defaulted because Petitioner did not file a contemporaneous objection to the questions and the court therefore reviewed the issue only for plain error. I agree.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-

37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception can be met only in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. Even though the court of appeals applied a limited review of the claimed error to determine whether it affected the outcome, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins*, 539 U.S. 510 (citing *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000)); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *accord Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994). It is clear that

- 24 -

the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or manifest injustice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner fails to assert any cause excusing his procedural default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"

*Coleman*, 244 F.3d at 540 (quoting *Schlup*, 513 U.S. at 329). Accordingly, I conclude that Petitioner's prosecutorial misconduct claim is procedurally defaulted.

Moreover, even were the Court to consider the merits of the issue, Petitioner would not be entitled to relief. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Sixth Circuit has emphasized that claims of prosecutorial misconduct "are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). "[S]tate courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"

*Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645). The federal

courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d

466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United*

*States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307,

328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first

type impermissibly places the government's prestige behind the witness to bolster the witness'

credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir.

1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible

vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other

evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief

in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796

(6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

      Neither type of vouching is involved in this case. Petitioner does not allege that the

prosecutor either placed the government's prestige behind the victim or invited the jury to believe

that the prosecutor knew of other evidence of Petitioner's guilt. Instead, the prosecutor merely asked

if the victim appeared credible and if her demeanor was appropriate. (*See* Tr. II at 106.) The court

of appeals concluded that both questions were proper under Michigan law. The Sixth Circuit

repeatedly has recognized "'that a state court's interpretation of state law, including one announced

on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"

*Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

      Moreover, the *Darden* factors weigh heavily against Petitioner. As discussed, no

objection was raised at the time of trial. The questions were isolated and had little tendency to

mislead, given Ruggles' description of the victim's demeanor and statements. Further, only one of the challenged questions was actually answered with opinion testimony. Deputy Ruggles answered the credibility question by indicating that the victim's statements were consistent -- a factual observation rather than an opinion. Ruggles did not express an opinion as to credibility. Ruggles' only opinion was that the victim presented appropriately for someone who had been sexually assaulted. Further, in light of the victim's unchanging story, Ledezma's supporting testimony, and the conclusiveness of the DNA evidence on the panties, the questions, even if improper, could not have had any influence on the verdict. Taken together, the factors weigh against a finding of prosecutorial misconduct, and the state-court's decision therefore constituted an entirely reasonable application of Supreme Court precedent.

In sum, Petitioner's first ground for habeas relief was procedurally defaulted. Even properly raised, the issue is meritless.

## II.   Double Jeopardy

In his second ground for habeas relief, Petitioner contends that his convictions on both CSC I and CSC III, based on the same transaction, violated his rights under the Double Jeopardy Clause of the Fifth Amendment, made applicable to the states by the Fourteenth Amendment. The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This clause protects against multiple punishments for the same offense. *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Costo v. United States*, 904 F.2d 344 (6th Cir. 1990). The protection against multiple punishments for the same criminal act "is designed to insure that the sentencing discretion of courts is confined to the limits established by the legisla-

ture." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). This guarantee serves principally as a restraint on courts and prosecutors, not on legislatures. *See Garrett v. United States*, 471 U.S. 773, 793 (1985) (no double-jeopardy violation when Congress intended to permit prosecution for continuing criminal enterprise after prior conviction for predicate offense); *Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983). Therefore, when determining whether punishments are "multiple" under this aspect of the Double Jeopardy Clause, the court is bound by the intent of the legislature. *Johnson*, 467 U.S. at 499; *Hunter*, 459 U.S. at 366-68.

In this context, the United States Supreme Court has traditionally applied the "same-elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See Rutledge v. United States*, 517 U.S. 292, 297 (1996). The same-elements test, also known as the "*Blockburger* test," inquires whether each offense contains an element not contained in the other. If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. If not, they are the "same offense" and double jeopardy bars additional punishment. *See Brown v. Ohio*, 432 U.S. 161, 168-69 (1977). If the *Blockburger* test is satisfied, however, it is presumed that the legislature intended to punish the defendant under both statutes and there is no double jeopardy bar to multiple punishments. *Whalen v. United States*, 445 U.S. 684, 691-92 (1980).

Applying *Blockburger*, the Michigan Court of Appeals rejected Petitioner's claim:

The constitutional prohibitions against double jeopardy, US Const, Am V; Const 1963, art 1, § 15, protect an individual against multiple punishments for the same offense. *Nutt*, 469 Mich at 574. The Court in *Garland*, 286 Mich App at 4-5, stated:

To determine whether a defendant has been subjected to multiple punishments for the "same offense," we must first look to determine whether the Legislature expressed a clear intention that multiple punishments be imposed. Where the Legislature clearly intends to impose such multiple punishments, there is no double jeopardy violation. Where the Legislature has not clearly expressed an intention to impose multiple punishments, the elements of the offenses must be compared using the *Blockburger* test.

Under the *Blockburger* test, if each offense "requires proof of a fact which the other does not" then there is no violation of double jeopardy. However, because the *Blockburger* test is simply a tool used to ascertain legislative intent, the focus must be on a comparison of the abstract legal elements of the offenses and not on the particular facts of the case. [Citations omitted.]

In this case, following the preliminary examination, defendant was bound over for trial on CSC I, MCL 750.520b(1)(f) (sexual penetration accomplished through force and coercion and causing personal injury), and CSC III, MCL 750.520d(1)(a) (sexual penetration with a person at least 13 years of age and under 16 years). On the first day of trial, the prosecutor moved to amend the information to include the CSC I and CSC III offenses as separate, rather than alternative, charges. He argued that the case was "on all fours" with *Garland*. The trial court agreed, and granted the motion to amend. Following trial, defendant was convicted of CSC I and CSC III, and sentenced to 12 to 40 years' imprisonment for each conviction.

In *Garland*, the defendant engaged in two acts of sexual penetration: sexual intercourse and cunnilingus. For each act of sexual penetration, the defendant was tried and convicted of two criminal offenses: CSC I on the theory that a sexual penetration occurred during the commission of a felony, MCL 750.520b(1)(c), and CSC III on the theory that the victim was physically helpless, MCL 750.520d(1)(c). The Court determined that the *Blockburger* test must be used to determine whether the defendant's convictions violated double jeopardy protections because nowhere in the CSC chapter of the criminal code did the Legislature express an intent to impose multiple punishments. *Garland*, 286 Mich App at 5. Looking at the "abstract, statutory elements" of the CSC offenses with which the defendant was charged, the Court held that the defendant's convictions did not violate double jeopardy protections. *Id.* at 5-6. It explained:

MCL 750.520b(1)(c) requires proof that the sexual penetration occurred "under circumstances involving the commission of any other felony." This is not an element of MCL 750.520d(1)(c). MCL 750.520d(1)(c) requires proof that the sexual penetration occurred

and was accompanied by the actor knowing or having "reason to know that the victim [was] . . . physically helpless." This is not an element of MCL 750.520b(1)(c). Thus, under the *Blockburger* test, because each offense contains an element that the other does not, CSC I and CSC III are separate offenses for which defendant was properly convicted and sentenced, without violating defendant's double jeopardy protection against multiple punishments. [*Id.*]

Here, looking at the abstract, statutory elements of the CSC I and CSC III offenses with which defendant was charged, we hold that defendant's convictions and sentences for the offenses do not violate defendant's double jeopardy protections. MCL 750.520b(1)(f) requires proof of a sexual penetration and that "[t]he actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration." Personal injury and force or coercion are not elements of MCL 750.520d(1)(a). MCL 750.520d(1)(a) only requires proof of a sexual penetration with another person who "is at least 13 years of age and under 16 years of age." The victim's age is not an element of MCL 750.520b(1)(f). Accordingly, because each offense contains an element that the other does not, defendant's convictions and sentences for CSC I and CSC III do not violate defendant's constitutional protections against double jeopardy.

(MCOA Op. at 4-5, ECF No. 18 (footnote omitted).)

The court of appeals' recitation of the elements of CSC I and CSC III is a determination of state law that is binding on this Court. *See Stumpf*, 722 F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76). As is plainly apparent from the court's description of the elements of the offenses, each requires proof of an element not required for the other: only CSC I requires a finding that a defendant used force or coercion in the commission of the sexual assault; only CSC III requires proof that the victim was at least 13 and under 16 years of age at the time of sexual assault. The state court's determination that Petitioner was not subjected to unconstitutional multiple punishments therefore constitutes an entirely reasonable application of clearly established Supreme Court precedent.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.

Dated: December 14, 2015     /s/ Ray Kent
             RAY KENT
             United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).